IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 13-cv-00079-PAB-KMT

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,

    Plaintiff and Intervenor Defendant

v.

INTRAWEST ULC f/k/a Intrawest Corporation,
FEDERAL INSURANCE COMPANY,
NATIONAL FIRE INSURANCE COMPANY OF HARTFORD, and
CONTINENTAL CASUALTY COMPANY,

    Defendants,

INTRAWEST ULC f/k/a INTRAWEST CORPORATION,

    Third Party Plaintiff,

v.

WILLIS NORTH AMERICA, INC. f/k/a Willis Corroon Corporation,
WILLIS OF NEW YORK, INC.,
WILLIS INSURANCE BROKERAGE OF UTAH, INC.,
WILLIS OF NEW JERSEY, INC.,
WILLIS CONSTRUCTION SERVICES CORPORATION OF NEW JERSEY f/k/a Willis Corroon Construction Services Corporation of New Jersey,
WILLIS CORROON CONSTRUCTION SERVICES CORPORATION OF CONNECTICUT,
WILLIS CORROON CONSTRUCTION SERVICES CORPORATION,
WILLIS OF NEW HAMPSHIRE, INC. f/k/a Willis Corroon Corporation of New Hampshire,
WILLIS OF MASSACHUSETTS, INC., and
JOHN DOE WILLIS ENTITY,

    Third Party Defendants

v.

INTRAWEST U.S. HOLDINGS INC.,
INTRAWEST RESORTS, INC., UPPER BENCH DEVELOPMENT CORPORATION,
INTRAWEST CALIFORNIA HOLDINGS, INC.,

SIERRA STAR THREE DEVELOPMENT CORPORATION,
THE STRATTON CORPORATION, and
INTRAWEST STRATTON DEVELOPMENT CORPORATION,

    Intervenor Plaintiffs.

**ORDER**

This matter is before the Court on the Motion to Dismiss Intervenors' Bad Faith Claims and Memorandum of Law in Support [Docket No. 231] filed by plaintiff and intervenor defendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union").

## I. BACKGROUND

### A. National Union's Complaint

This action arises out of an insurance coverage dispute. Intrawest ULC, f/k/a Intrawest Corporation ("Intrawest") and its affiliates develop ski resorts in the United States and Canada. Docket No. 1 at 4, ¶ 10. National Union and Intrawest entered into an indemnity agreement. *Id.* at 6, ¶ 18. As a result of the indemnity agreement, National Union provided Intrawest insurance coverage under the Owner Controlled Insurance Program ("OCIP"). *Id.* at 6, ¶¶ 18-20. Pursuant to the OCIP, National Union issued five commercial general liability ("CGL") insurance policies (the "National Union policies"). *Id.* at 8, ¶ 25. As part of the OCIP, National Union and Intrawest entered into a Paid Loss Addendum and Policy and Funding Schedule, which was applicable to policies starting from April 30, 1998 to April 30, 2001, and a subsequent Paid Loss Addendum and Policy and Funding Schedule, which was applicable to policies starting

from April 30, 2001 to December 31, 2002 (collectively, the "Paid Loss Addenda"). *Id.* at 7, ¶ 22. National Union alleges that the Paid Loss Addenda placed a $5,000,000 Completed Operations Aggregate limit on coverage for all projects. *Id.* at 7, ¶ 24.

Defendant Federal Insurance Company issued a CGL policy to Intrawest, a policy which National Union claims applies in excess of the National Union policies. *Id.* at 9, ¶¶ 29-30. National Fire Insurance Company and Continental Casualty Company issued CGL policies to Engelberth Construction, Inc. ("Engelberth") incident to certain condominium construction projects developed by Intrawest, policies which National Union claims may implicate coverage for Engelberth under the OCIP. *Id.* at 10, ¶ 31.

Beginning in 1998, Intrawest and its affiliates began developing a number of ski resort properties. *Id.* at 4, ¶ 11. Various homeowners associations instituted claims and lawsuits against Intrawest and its affiliates seeking compensation for property damage allegedly caused by construction defects. *Id.* at 4, ¶ 12. At least seven lawsuits were commenced in the United States and Canada against Intrawest, its affiliates, general contractors, and subcontractors. *Id.* at 4, ¶ 13. Although not brought directly against Intrawest or its affiliates, at least three other lawsuits have been filed that potentially implicate coverage under the National Union policies. *Id.* at 5, ¶ 15. The claims all relate to allegations of faulty construction and design. *Id.* at 5-6, ¶ 16.

On January 14, 2013, National Union filed the instant case seeking a declaratory judgment that the National Union policies' aggregate limit is $5 million and that, upon paying the aggregate limit, National Union's obligations under the National Union policies are satisfied. Docket No. 1 at 11-12. On November 19, 2013, Intrawest filed a

third party complaint in this case against Willis North America, Inc. f/k/a Willis Corroon Corporation and its affiliates (collectively, the "Willis entities"). Docket No. 136. Intrawest claims that it engaged the Willis entities to acquire the OCIP, but that the Willis entities breached their duty to ensure that the National Union policies provided a $5 million per-project, rather than aggregate, limit. *Id.* at 4, ¶ 16. Intrawest alleges that, if National Union's declaratory judgment action is successful, the Willis entities will be responsible for Intrawest's damages. *Id.*

### B. The Intervenors' Complaint[1]

On February 18, 2014, the assigned magistrate judge granted a motion to intervene filed by Intrawest U.S. Holdings, Inc. ("U.S. Holdings"), Intrawest Resorts, Inc. ("Intrawest Resorts"), Upper Bench Development Corporation ("Upper Bench"), Intrawest California Holdings, Inc. ("Intrawest California"), Sierra Three Star Development Corporation ("Sierra"), the Stratton Corporation ("Stratton"), and Intrawest Stratton Development Corporation ("Intrawest Stratton") (collectively, the "intervenors"). Docket No. 204. That same day intervenors filed their complaint. Docket No. 205.

Intervenors developed real estate projects covered by the National Union policies or are named defendants in lawsuits arising from real estate projects covered by the National Union policies. *Id.* at 3, ¶ 13; *see also id.* at 4-5, ¶¶ 14-19. National Union knew that Intrawest purchased the OCIP for liability coverage. It agreed to provide such coverage and continued to acknowledge its agreement to provide a $5

---

[1]The following facts are taken from the Complaint in Intervention Against National Union Fire Insurance Company of Pittsburgh, PA (the "intervenors' complaint") [Docket No. 205] and are presumed true for purposes of resolving the present motion.

million per project limit. *Id.* at 5, ¶ 21. The National Union policies were the primary, or first layer, of coverage for the OCIP and were written and intended to provide coverage for construction defect claims. *Id.* at 7, ¶ 30.

Intervenors and others tendered 20 claims to National Union under the OCIP, most involving construction defects and resulting property damage at properties developed by Intervenors. *Id.* at 6, ¶ 22. Intervenors' claims under the policy exceeded $25 million. *Id.* at 6, ¶ 23.

Intervenors claim that National Union unreasonably failed to properly investigate intervenors' claims or provide consistent coverage under the OCIP throughout the entire course of Intrawest's and intervenors' relationship with National Union. *Id.* at 6-7, ¶ 24, 29. In some instances, National Union paid intervenors' claims after delay, but, in other instances, National Union failed to respond or asserted that the OCIP was not intended to provide coverage for construction defect claims despite its clear understanding to the contrary. *Id.* at 6, ¶ 22. When confronted with intervenors' claims, National Union "invented" its theory that the OCIP had a $5 million aggregate limit and thereby attempted to change the terms of the National Union policies. *Id.* at 6-7, ¶¶ 25-26.

Stratton developed the Solstice Trailside project in Vermont. *Id.* at 9, ¶ 35. After construction was completed, the Solstice Trailside HOA demanded that Stratton repair the roof and related damage, which Stratton did at a cost of approximately $2 million. *Id.* at 9, ¶ 36. Stratton developed the Long Trail House project in Vermont and, after completing construction, received and paid more than $7 million to resolve claims

against it for damage associated with construction defects. *Id.* at 9, ¶¶ 38-39. Stratton submitted claims to National Union for both projects, but National Union has not communicated its coverage position to Stratton. *Id.* at 9-10, ¶¶ 37, 40.

Upper Bench developed the Eagle Run project in California and made repairs and paid $1.2 million to resolve a demand by the development's HOA related to a defect with the project's podium deck. *Id.* at 10, ¶ 42. Upper Bench submitted a claim to National Union, who has not communicated its coverage position and has not provided Upper Bench with necessary documents and information. *Id.* at 10, ¶ 43. Subsequently, the Eagle Run HOA filed a lawsuit against Upper Bench seeking to recover damages related to construction defects. *Id.* at 11, ¶¶ 44-45. National Union is defending Upper Bench in the lawsuit. However, despite rejecting multiple reasonable settlement demands falling within the National Union policies' limits, National Union has erroneously asserted that at least one of the settlement demands did not fall within the National Union policies' limits and threatened to withdraw its defense of Upper Bench entirely because National Union believes the National Union policies' limits are near exhaustion. *Id.* at 11, ¶¶ 45-47.

Sierra developed the Mammoth Green project in California, but was sued by the development's HOA for damages related to construction defects. *Id.* at 11-12, ¶ 49. Sierra tendered a claim to National Union for defense and indemnity. National Union offered to defend Sierra in the suit, but threatened to withdraw its defense based upon its position that the National Union policies have a $5 million aggregate limit. *Id.* at 12, ¶ 50.

Intrawest Resorts developed the Union Creek Townhomes project in Colorado. *Id.* at 12, ¶ 51. The HOA demanded that Intrawest Resorts repair property damage arising from construction defects, which Intrawest Resorts did at a cost of approximately $900,000. *Id.* Intrawest Resorts tendered a claim to National Union, who began an investigation, but has refused to communicate its coverage position or provide Intrawest Resorts with documents related to the claim. *Id.* at 12, ¶ 52.

The intervenors bring seven claims for relief against National Union. The first claim for relief is asserted by Stratton and Intrawest Stratton for breach of contract; the second claim for relief is asserted by Stratton Intrawest Stratton, Upper Bench, and Intrawest Resorts for breach of the duty to indemnify; the third claim for relief is asserted by Stratton, Intrawest Stratton, Upper Bench, and Intrawest Resorts for common law bad faith breach of insurance contract (the "common law claim"); the fourth claim for relief is asserted by Stratton, Intrawest Stratton, Upper Bench, and Intrawest Resorts for violation of Colo. Rev. Stat. § 10-3-1115 and § 10-3-1116 (the "statutory claim"); the fifth claim for relief is asserted by all intervenors for declaratory judgment; and the sixth claim for relief is asserted in the alternative by all intervenors for reformation of the National Union policies. *Id.* at 12-18.

On March 21, 2014, National Union filed the present motion, arguing that intervenors' common law claim and statutory claim should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). Docket No. 231.

## II. STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (alteration marks omitted ).

### III. ANALYSIS

#### A. Statutory Claim

National Union argues that intervenors' statutory claim must be dismissed because intervenors are not "first party claimaint[s]" pursuant to § 10-3-1115 and § 10-3-1116. Docket No. 231 at 6-7. First-party claimants "whose claim for payment of benefits has been unreasonably delayed or denied may bring an action in district court

to recover reasonable attorney fees and court costs and two times the covered benefit."

§ 10-3-1116. For purposes of § 10-3-1115 and § 10-3-1116:

> (I) "First-party claimant" means an individual, corporation, association, partnership, or other legal entity asserting an entitlement to benefits owed directly to or on behalf of an insured under an insurance policy. "First-party claimant" includes a public entity that has paid a claim for benefits due to an insurer's unreasonable delay or denial of the claim.
>
> (II) "First-party claimant" does not include:
>
> (A) A nonparticipating provider performing services; or
>
> (B) A person asserting a claim against an insured under a liability policy.

§ 10-3-1115(1)(b).

National Union argues intervenors are not first-party claimants under the statute because they assert claims under a CGL policy, which courts traditionally recognize at common law as "third-party" claims. Docket No. 231 at 9. The Court disagrees. At common law, a first-party bad faith claim arises "when an insurance company delays or refuses to make payments 'owed directly to its insured under a first-party policy such as life, health, disability, property, fire, or no-fault auto insurance.'" *Nunn v. Mid-Century Ins. Co.*, 244 P.3d 116, 119 (Colo. 2010) (quoting *Goodson v. Am. Standard Ins. Co.*, 89 P.3d 409, 414 (Colo. 2004)). A third-party bad faith claim arises "'when an insurance company acts unreasonably in investigating, defending, or settling a claim brought by a third person against its insured under a liability policy.'" *Id.* (quoting *Goodson*, 89 P.3d at 414). However, in enacting § 10-3-1115 and § 10-3-1116, the Colorado General Assembly "intended to create an express private right of action . . . in addition to and different from common law bad faith claims." *Kisselman v. Am. Family*

*Mut. Ins. Co.*, 292 P.3d 964, 972 (Colo. App. 2011). The statutes "cannot be read as simply restating the common law standard" for bad faith claims. *See id.* at 973; *Kyle W. Larson Ent., Inc. v. Allstate Ins. Co.*, 305 P.3d 409, 411-412 (Colo. App. 2012) (noting that General Assembly defined "first-party claimant" broadly). To that end, in explicitly defining who may bring a statutory bad faith claim, the General Assembly chose not to rely on the traditional common law understanding of first-party and third-party claims. There is no indication, as National Union argues, that the General Assembly intended for "first-party claimant" to mean only those persons who can bring "first-party claims" at common law. *See* Docket No. 231 at 7. Rather, the statute clearly and unambiguously defines the term "first-party claimants" and, in doing so, does not explicitly endorse a life, health, or disability insured's ability to bring a statutory claim any more than it precludes a CGL insured from bringing a statutory claim. The Court finds that the plain language of § 10-3-1115 clearly and unambiguously sets forth the definition of "first-party claimant" with respect to intervenors' statutory claim. Although the Court on different facts reached a contrary conclusion, *see Gustafson v. Am. Family Mut. Ins. Co.*, 901 F. Supp. 2d 1289, 1304 (D. Colo. 2012), the Court joins the weight of authority concluding that the plain language of § 10-3-1115(1)(b)(I) is controlling and does not preclude CGL insureds from bringing a statutory bad faith claim. *See Oakland Constr. Co., Inc. v. Phoenix Ins. Co.*, No. 11-cv-02652-LTB-BNB, 2013 WL 2285778, at *5 (D. Colo. May 23, 2013) (concluding that insured seeking indemnity from insurer under CGL policy was first-party claimant under plain language of § 10-3-1115(1)(b)(I)); *D.R. Horton, Inc. - Denver v. Mountain States Mut. Cas. Co.*, No. 12-cv-01080-RBJ, 2013

WL 674032, at *2 (D. Colo. Feb. 25, 2013) (ruling that CGL insured seeking repayment for defense costs in underlying action was first-party claimant); *D.R. Horton, Inc. - Denver v. Travelers Indem. Co. of Am.*, No. 10-cv-02826-WJM-KMT, 2012 WL 5363370, at *11 (D. Colo. Oct. 31, 2012) ("where the claim is brought by the insured seeking to recover its own incurred defense fees and costs, as is the case here, the Court finds it indisputable that the benefits are 'owed directly to or on behalf of [the] insured'") (quoting § 10-3-1115(1)(b)(I)); *see also* Docket No. 242-2 at 4 (*Stresscon Corp. v. Rocky Mountain Structures, Inc.*, No. 09CV3252 (Denver Cnty., Colo. Dist. Ct. April 22, 2010) (concluding that definition of "first-party claimant" clearly and unambiguously applies to "any insured who claims his insurer owes him a benefit under a contract of insurance")). National Union's attempts to distinguish these cases are unavailing, *see* Docket No. 247 at 5-7, and, because the statute's definition of "first-party claimant" is unambiguous, the Court does not find it necessary to, as National Union suggests, use the legislative history of § 10-3-1115 and § 10-3-1116 as an interpretive tool. *See McKinney v. Kautzky*, 801 P.2d 508, 509 (Colo. 1990) ("If the language in the statute is clear and the intent of the General Assembly may be discerned with reasonable certainty, it is not necessary to resort to other rules of statutory interpretation.").

National Union argues that, because intervenors seek "damages" resulting from their satisfaction of underlying claims, intervenors do not seek "benefits" as that term is used in § 10-3-1115 and § 10-3-1116. Docket No. 231 at 9. Intervenors respond that, under the plain and ordinary meaning of the word "benefits," a CGL policy's benefits

11

include payment of defense costs and indemnity for covered claims.  Docket No. 242 at 6-7 (citing *Bernhard v. Farmers Ins. Exchange*, 885 P.2d 265, 271 (Colo. App. 1994)).  The Court agrees with intervenors.  National Union's arguments to the contrary are unpersuasive and contrary to those cases recognizing that defense and indemnity costs are benefits of a CGL insurance policy.  *See, e.g.*, *Oakland Constr.*, 2013 WL 2285778, at *5.

Intervenors allege that they are insured under the National Union policies, Docket No. 205 at 8, ¶ 34, and that those policies provide benefits in the form of liability coverage for construction defect claims, including indemnity and defense with respect to such claims.  *Id.* at 5-6, ¶¶ 20, ¶ 24.  Intervenors allege that National Union has failed to provide benefits due intervenors under the National Union policies by refusing to reimburse them for claims they have settled with third parties or threatening to withdraw its defense of intervenors in pending litigation.  *See, e.g.*, *id.* at 12, ¶¶ 50, 52.  As a result, under the plain language of § 10-3-1115(1)(b)(I), intervenors have sufficiently alleged that they are first-party claimants.

National Union argues, in the alternative, that intervenors' statutory claim cannot be based upon events occurring prior to August 5, 2008, the day that § 10-3-1115 and § 10-3-1116 took effect.  Docket No. 231 at 11.  Intervenors respond that their complaint alleges conduct which post-dated the enactment of the statutes and that it would be inappropriate to dismiss only a portion of their statutory claim.  Docket No. 242 at 13.  The statutes "create a . . . right of action . . . which is available for acts occurring after August 5, 2008."  *Vaccaro v. Am. Family Ins. Grp.*, 275 P.3d 750, 757

(Colo. App. 2012); *accord Kisselman*, 292 P.3d at 975. An insurer breaches its duty under the statutes "if it engages in post-effective date acts of unreasonable delay or denial regardless of when an insured originally made a claim for benefits under his or her insurance policy." *Kisselman*, 292 P.3d at 975-76.

The question then becomes whether, with respect to each claim under the National Union policies, sufficient allegations exist to conclude that National Union engaged in acts of unreasonable delay and/or denial after August 5, 2008. Although intervenors allege that they made claims to National Union under the National Union policies as early as 2000, intervenors allege that National Union has not yet communicated its coverage position or otherwise paid intervenors' claims. *See, e.g.*, Docket No. 205 at 9-10, ¶¶ 38-41. Such allegations, when viewed in the light most favorable to intervenors, do not foreclose the possibility that National Union engaged in acts of unreasonable delay and/or denial after August 5, 2008. *Cf. Morrissey v. Allstate Ins. Co.*, No. 08-cv-02174-LTB-MJW, 2009 WL 1384099, at *1 (D. Colo. May 14, 2009) (declining to dismiss statutory bad faith claim under Fed. R. Civ. P. 12(b)(6) where subject accident occurred prior to August 5, 2008). Although intervenors' statutory claim is limited to acts of unreasonable delay and/or denial that occurred on or after August 5, 2008, the Court cannot now conclude as a matter of law that no such acts occurred after that date with respect to the subject claims. As a result, this aspect of National Union's motion is denied.

### B.  Common Law Claim

National Union argues that, because intervenors allege that they are first-party

claimants under § 10-3-1115, intervenors must plead a first-party common law bad faith claim. Docket No. 231 at 11-12. National Union reasons that "Intervenors cannot simultaneously be first-party claimants under §§ 1115 and 1116, and third-party claimants at common law." Docket No. 247 at 9-10. National Union's argument is without merit. As discussed above, the statutory definition of "first-party claimant" does not directly correspond with the common law understanding of first-party bad faith claims. The fact that intervenors may be first-party claimants with respect to their statutory claim has no bearing on their ability to bring a third-party common law bad faith claim. *See* § 10-3-1116(4) ("The action authorized in this section is in addition to, and does not limit or affect, other actions available by statute or common law, now or in the future."); *Kisselman*, 292 P.3d at 973.

Under Colorado law, an insurer must deal in good faith with its insured. *Decker v. Browning-Ferris Indus. of Colo., Inc.*, 931 P.2d 436, 443 (Colo. 1997). A common law third-party bad faith claim arises when an insurance company acts unreasonably in investigating, defending, or settling a claim brought by a third person against its insured under a liability policy. *Farmers Grp., Inc. v. Williams*, 805 P.2d 419, 421 (Colo. 1991). Unlike a first-party common law claim, an insured asserting a third-party claim need not show that the insurer acted knowingly or recklessly in disregarding the validity of an insured's claim. *See Trout v. Nationwide Mut. Ins. Co.*, 316 F. App'x 797, 801 (10th Cir. 2009) (unpublished). Rather, in a third-party claim, the insured "must show that a reasonable insurer under the circumstances would have paid or otherwise settled the third-party claim." *Goodson v. Am. Standard Ins. Co. of Wis.*, 89 P.3d 409, 415 (Colo.

2004). Reasonableness must be determined objectively, based upon proof of industry standards, but expert testimony is not necessarily required "where the standard of care does not entail specialized knowledge or skill beyond that of the average juror." See *Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 343 (Colo. 2004).

To the extent National Union argues that intervenors failed to allege that it acted knowingly or with reckless disregard, National Union's argument is without merit. Intervenors are not required to establish National Union's mental state as part of their third-party bad faith claim. See *Trout*, 316 F. App'x at 801. National Union also argues that, because the OCIP documents explicitly provide that the aggregate policy limit is $5 million, it acted reasonably as a matter of law in denying coverage or otherwise threatening to withdraw its defense of intervenors in pending litigation. Docket No. 231 at 12-13. However, the question of whether the National Union policies provided a $5 million per project limit or a $5 million aggregate limit is in dispute. Moreover, it is not entirely clear that National Union, in all instances, denied coverage of the intervenors' claims based upon its belief that policy limits were exhausted. *See, e.g.*, Docket No. 205 at 10, ¶ 40 ("National Union has never communicated its coverage position in response to Stratton's demand."). As a result, the Court cannot conclude that National Union's actions with respect to intervenors' claims under the National Union policies were reasonable as a matter of law. This aspect of National Union's motion to dismiss is therefore denied.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that National Union's Motion to Dismiss Intervenors' Bad Faith Claims [Docket No. 231] is **DENIED**.

DATED March 20, 2015.

                                        BY THE COURT:

                                        s/Philip A. Brimmer
                                        PHILIP A. BRIMMER
                                        United States District Judge