# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

No. 1:13-cv-00079-PAB-KMT

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.,

Plaintiff and Intervenor Defendant,

v.

INTRAWEST ULC f/k/a INTRAWEST CORPORATION,
FEDERAL INSURANCE COMPANY,
NATIONAL FIRE INSURANCE COMPANY OF HARTFORD, and
CONTINENTAL CASUALTY COMPANY,

Defendants.

INTRAWEST ULC f/k/a INTRAWEST CORPORATION,

Third-Party Plaintiff

v.

WILLIS NORTH AMERICA, INC. f/k/a WILLIS CORROON CORPORATION,
WILLIS OF NEW YORK, INC.,
WILLIS INSURANCE BROKERAGE OF UTAH, INC.,
WILLIS OF NEW JERSEY, INC.,
WILLIS CONSTRUCTION SERVICES CORPORATION OF NEW JERSEY f/k/a WILLIS
CORROON CONSTRUCTION SERVICES CORPORATION OF NEW JERSEY,
WILLIS CORROON CONSTRUCTION SERVICES CORPORATION OF CONNECTICUT,
WILLIS CORROON CONSTRUCTION SERVICES CORPORATION,
WILLIS OF NEW HAMPSHIRE, INC. f/k/a WILLIS CORROON CORPORATION OF NEW
HAMPSHIRE, and
WILLIS OF MASSACHUSETTS, INC.,

Third-Party Defendants.
_____

# NATIONAL UNION'S OPPOSITION TO
## INTRAWEST'S MOTION FOR PARTIAL SUMMARY JUDGMENT
_____

## I.    INTRODUCTION

National Union previously sought summary judgment based solely on the owner

controlled insurance program ("the Program") issued to Intrawest. In response, defendants

demanded discovery.  With discovery complete, Intrawest seeks summary judgment by taking the policies' language out of the broader context of the Program it procured.  Intrawest's motion must be denied because the Program documents and undisputed evidence in discovery confirm that the total completed operations aggregate limit is $5 million for all Intrawest projects.

The Court must consider more than just the single Endorsement on which Intrawest relies.  Intrawest agreed to a Program governed by an Indemnity Agreement and completed by certain Paid Loss Addendum and Policy Schedules ("Schedules") and five insurance policies.  In Intrawest's own words in a 2003 lawsuit involving the same Program, "this case is unlike most insurance cases, where the policy is the only contract in issue… The ultimate obligations of National Union are defined therefore not by the component Policies … but by the Program … the Court must examine the policies in their context, which is the OCIP, not [in] a void…"

Intrawest's current position that the Program has a $5 million aggregate limit for each of its 71 projects (equivalent to $355 million in coverage) is controverted by the Program documents. The policies' declarations pages provide a $5 million completed operations aggregate limit. Endorsement 9 clarifies that the full $5 million aggregate is available for each project instead of a pro rata share of the limit. Most telling, the Schedules confirm that the completed operations aggregate limit is $5 million for all Intrawest projects:

| Per Project | |
| --- | --- |
| $2,000,000 | per occurrence |
| $5,000,000 | General Aggregate |
| $5,000,000 | Completed Operations Aggregate |
| | |
| **All Projects** | |
| $15,000,000 | General Aggregate |
| ***$5,000,000*** | ***Completed Operations Aggregate*** |

The documents obtained in discovery—nearly a million pages of documents and forty depositions—also contradict Intrawest's position.  It is undisputed that National Union emailed

Intrawest's broker, Willis, stating: "*the limit will apply per project but the total aggregate for all losses in the Extension will remain $5,000,000.*" Over five years**,** National Union repeatedly relayed this message to Willis. Neither Willis nor Intrawest disputed it because—as Willis's interrogatory responses admit—Intrawest never asked for separate limits for each of its 71 projects. A Program offering $355 million in coverage would require a premium far beyond the $560,777 Intrawest paid, if National Union would have underwritten that enormous risk at all.

Intrawest's pre-litigation communications further contradict its present position. Intrawest advised a contractor that Federal would drop down if the $5 million limits eroded. Intrawest also warned its second-layer excess carrier, Reliance, that it would have to drop down if damages exceeded National Union's $5 million limit and Federal's $10 million limit. Only when it became clear that the $5 million aggregate limit would be exhausted, and that claims would enter insolvent carrier Reliance's excess coverage, did Intrawest attempt to rewrite the Program to provide $355 million in coverage—71-times more than it requested and paid for.

Accordingly, the Program documents, Willis's communications, and Intrawest's admissions conclusively establish that Intrawest requested, and the Program provides, a $5 million completed operations limit for all projects. Respectfully, this Honorable Court can only accept Intrawest's current position by engaging in what Intrawest cautioned a prior court not to do: consider the policies in a "void," instead of in context.  Intrawest's motion for partial summary judgment should be denied in its entirety, with prejudice.

## II.    RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

1-12, 14, 16-22.  Admitted.

13, 15. National Union admits that Intrawest accurately quoted a portion of the policies, but denies that the policies contain the italics added by Intrawest.  *See* ECF No. 523-3 at INT006675, 6727; ECF No. 523-4 at INT002957, 2952.

## III.   STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

1.      The full undisputed material facts are set forth in National Union's motion for summary judgment filed October 30, 2015, which is fully incorporated herein.  ECF No. 549.

### A.    The Parties and Policies

2.      In 1998, Intrawest engaged Willis as its broker to negotiate and obtain an owner controlled insurance program that ultimately provided $80 in liability coverage for damage during construction ("ongoing operations"), and after construction is completed ("completed operations").  Ex. 1.

3.      The $5 million primary Program provided by National Union consists of an Indemnity Agreement, two Schedules, and five commercial general liability policies.  Ex. 2-9.

4.      The "Limits of Insurance" on the declarations pages of each policy provide a $5 million general aggregate and a $5 million completed operations aggregate. Ex. 5-9 at 6671; 2954; 2883; 2424; and 6476.

5.      The policies' "Section III – Limits of Insurance" explains "[t]he Limits of Insurance shown in the Declarations and rules below fix the most we will pay…" and the "completed operations aggregate limit" is the most National Union will pay for completed operations damages. Ex. 5-9 at 6684; 2966; 2891; 2431; and 6483.

6.      The $75 million tower of excess coverage consists of a Federal umbrella policy, Reliance excess policy, and then another Federal excess policy, each of which has a single completed operations limit for all locations.  Ex. 10-12.

**B.**     **National Union Offered a $5 Million Total Completed Operations Aggregate**

7.     On April 27, 1998, Geoffrey Hall (National Union) sent a proposal to Willis that offered ongoing operations coverage with limits of $2 million each occurrence, subject to a $5 million general aggregate applicable to each project, capped by a $15 million general aggregate for all locations. Ex. 13; Ex. 14 at ¶ 3-7.

8.     The proposal also offered a completed operations limit of $5 million aggregate per location capped by a $5 million all locations aggregate limit in a Limits of Liability chart:

> **Per Location:**
> General Aggregate                                     $5,000,000 *Per Project
> Products / Completed Operations Aggregate             $5,000,000
>
> **All Locations:**
> General Aggregate                                     $15,000,000
> Products / Completed Operations Aggregate             $5,000,000
>
> Reinstatement of Aggregate Limits Annually except for the five (5) Year Products/Completed Operations Extension Period which will have One Aggregate for the Extended Reporting Period. (Ex. 13).

9.     Intrawest ultimately enrolled at least 71 projects in the Program.  Ex. 15; Ex. 16 at 144:14-16; 151:5-7, 23-25; 152:1-4.

**C.**     **Willis Bound Coverage for a $5 Million All Locations Aggregate**

10.     On May 7, 1998, William Bridgman (Willis) wrote to Mr. Hall (National Union) advising that Willis had authority to bind the program offered in National Union's proposal.  Ex. 17; Ex. 14 at ¶ 10.

11.     On May 13, 1998, Craig Parrow (Willis) asked Mr. Hall whether the completed operations coverage "applies on a 'per project' basis similar to the 'primary' CGL."  Ex. 18.

12.     Mr. Parrow's reference to the "primary CGL" pertained to the ongoing operations limit, which had a per project rather than a per location limit.  Ex. 14 at ¶ 12.

13.     Mr. Parrow testified that he did not request to alter the "all locations" aggregate:

Q: When you ask – so in your confirmation, when you were asking them to confirm that the Completed Operations extension applies on a per-project basis, are you asking whether or not there's no all locations aggregate limit for the Products/Completed Operations?

A: No, I'm not asking that.  (Ex. 19 at 91:15-21).

14.     Mr. Hall emailed Mr. Parrow an hour later on May 13, 1998 stating "**there is only one aggregate for the entire Extension Period.  The limit will apply per project but the total aggregate for all losses in the Extension will remain $5,000,000**.  If there are any other questions please let me know."  Ex. 18; Ex. 14 at ¶ 13-14 (emphasis added).

15.     Mr. Parrow (Willis) did not respond to Mr. Hall's email confirming the $5 million aggregate.  Ex. 19 at 98:22-25, 99:1-2; Ex. 14 at ¶ 15.

16.     On May 22, 1998, Mr. Hall (National Union) issued a binder to Willis, which outlines the overarching agreed terms of coverage later memorialized in an insurance policy.  Ex. 20; Ex. 21 at 185:20-25; 186:1-11; Ex. 14 at ¶ 16-17.

17.     The binder confirmed National Union's agreement to provide the same limits as set forth in National Union's proposal in a Limits of Liability chart.  Ex. 20.

18.     An optional ten-year extension was selected for a total premium of $560,777 (Ex. 23 at 11), consistent with a potential exposure of $5 million total.  Ex. 14 at ¶ 18.

19.     National Union would not have issued a Program allowing unlimited enrollment without an aggregate and would have required an exponentially higher premium for $5 million at each project without any overall cap (up to $355 million for the 71 projects).  Ex. 14 at ¶ 26-29.

20.     National Union provided a copy of the 1998-1999 policy to Willis containing an endorsement extending the $5 million completed operations limit for five years.  Ex. 22.

21.     On March 2, 1999, Mr. Parrow (Willis) wrote to Joseph Riela (National Union), stating that the endorsement should say that the extended reporting period is 10 years and the aggregate is not reinstated annually and applies "per project." Ex. 23.

22.      On March 12, 1999, Mr. Riela (National Union) responded to Mr. Parrow (Willis), advising that "we are not in agreement that the $5 million aggregate [applies] separately per project. **To clarify, the $5 million aggregate, as stated in the binder, applies to all projects and is not reinstated annually**." Ex. 24 (emphasis added).

23.     Later that day, Mr. Parrow (Willis) forwarded his May 13, 1998 email exchange with Mr. Hall (National Union) to Mr. Riela (National Union). Ex. 25.

24.     Mr. Riela (National Union) contacted Mr. Hall (National Union), who confirmed that the per location limit could be changed to per project like the primary CGL, but the total limit remained $5 million as stated in Mr. Hall's May 13, 1998 email. Ex. 14 at ¶ 23.

25.     That same day, Mr. Riela (National Union) emailed Mr. Hall (National Union) stating "based on your response, the Completed Operations Agg does apply on a per project basis. I will make this change on the endorsement." Ex. 25.

26.     Mr. Riela (National Union) agreed to effectuate the May 13, 1998 email that had been forwarded to him, such that "[t]he limit will apply per project but the total aggregate for all losses in the Extension will remain $5,000,000." Ex. 21 at 94:13-25, 95:1-4, 136:12-25, 137:1, 184:5-21, 209:17-25, 210:1-10, 211:11-25, 212:1-6, 218:4-25, 219:1-4.

27.     Three days later, Mr. Parrow (Willis) mailed Mr. Greehey (Intrawest) the 1998-1999 policy and advised the endorsement should say that the completed operations aggregate "is not reinstated annually" and "applies separately 'per project.'" Ex. 26.

28.     National Union thereafter issued a corrected policy containing Endorsement 9:

It is agreed that, Products Completed Operations coverage is extended for a period of ten (10) years which will commence when that portion of the project is put to its intended use or a temporary or permanent certificate of occupancy is issued. **The products/completed operations limit is $5,000,000 each occurrence and $5,000,000 Aggregate for the extended completed operations period.**

It is also agreed and understood that the Products and Completed Operations Aggregate is not reinstated annually, however, it does apply separately on a per project basis.

**All other terms, conditions and exclusions remain the same.** (Ex. 5 at INT006727) (emphasis added).

29.     After an April 18, 2000 meeting, Mr. Parrow (Willis) emailed Mr. Riela to "summarize the items we discussed" and sought confirmation that AIG would offer rework coverage (coverage for repairs of improper work that has not necessarily caused damage) of $2 million per occurrence subject to a $5 million aggregate. Ex. 27 at 7971 ¶ 5.

30.     The next day, Mr. Riela (National Union) forwarded Mr. Parrow's email to Patricia Murphy (National Union) and advised that "Willis agreed to the following: 1) 5,000,000 completed operations applies to ALL locations… 2) rework endorsement erodes the completed operations limit… Willis asked if the rework agg can be increased to $ 5 mil from the $2 mill agg currently stated…  Since our total completed operation exposure remains at $5 mill, I thought we could agree to this." *Id.* at 7970 (underline original).

31.     On May 3, 2000, Mr. Riela emailed Mr. Parrow: "To clarify once again, the application of the Aggregate under the 'All Projects' section of the binder, as it pertains to the Completed Operations and Contractors Rework shall not exceed in combination $5,000,000 for the Extended Reporting Period as endorsed to the Policy." Ex. 28.  Mr. Parrow never contested the statements in Mr. Riela's email. Ex. 21 at 227:3-25, 228:1-8.

**D.     The Indemnity Agreement and Schedules Provide a $5 Million Total Limit**

32.     On May 10, 2000, Mr. Greehey executed the Indemnity Agreement, providing:

[National Union] is providing a unique Insurance and premium payment program (the 'Program') to … [Intrawest]… National Union will issue the insurance policies listed the Schedule(s). **Such policies … are governed by this Agreement… This Agreement, together with the Schedule(s) and Policy(ies), constitutes the Program. The Program is a uniquely negotiated, single contract and no part of the Program would have been issued without the other parts being in force.** (Ex. 2 at 81204-05 (emphasis added).

33.     The Schedule (Ex. 3 at 81200) delineates the Program's GL limits as follows:

**Per Project**
| | | |
|---|---|---|
| **$2,000,000** | per occurrence |
| **$5,000,000** | General Aggregate |
| **$5,000,000** | Completed Operations Aggregate |

**All Projects**
| | | |
|---|---|---|
| **$15,000,000** | General Aggregate |
| **$5,000,000** | Completed Operations Aggregate |

34.     Mr. Parrow (Willis), Bruce Dennis (Willis), and Mr. Greehey (Intrawest) all confirmed that the $5 million per project general aggregate for primary ongoing operations was subject to a $15 million general aggregate limit for all locations or projects as stated in the National Union proposal, binder, and Schedules.  Ex. 19 at 61:13-25, 62:1-25, 63:1-17; Ex. 29 at 71:16-72:5, 123:4-15, 127:10-15, 196:11-15; Ex. 16 at 104:13-19.

35.     Although the policies do not delineate the SIR aggregate of $500,000 or a $15 million general aggregate, those terms are included in the Schedules.  Ex. 3 at NU-CO 081203.

36.     Mr. Greehey and Mr. Dennis testified that the maximum self-insured retention under the Program was $500,000. Ex. 16 at 165:22-167:1; Ex. 29 at p. 80:11-25, 81:1-7.

37.     Mr. Greeley executed the Schedule on May 10, 2000.  Ex. 3 at NU-CO 081203.

**E.     National Union, Willis, and Intrawest Confirm the $5 Million Total Limit**

38.     On March 10, 2000, Mr. Bridgman (Willis) sent Mr. Parrow (Willis) an email stating the Program "reflects a per project completed ops agg of $5mm.  Yet is [sic] also shows a 5mm agg applicable to all projects."  Ex. 30.

39.     On April 5, 2000, Mr. Bridgman (Willis) wrote that the Program "is written to refelct [sic] the singe [sic] aggregate." Ex. 31.

40.     On January 20, 2001, Thomas Lanning (Willis) emailed Mr. Dennis (Willis) stating "Jim Greehey would like the C/Ops deductible reduced … Incidentally, the aggregate limit for the program for this coverage is $5,000,000." Ex. 32.

41.     On September 26, 2001, Mr. Lanning (Willis) emailed Mr. Riela (National Union) stating that other than the maximum premium rate, "all things stayed the same as on the issued policies." Ex. 33.

42.     Mr. Greehey (Intrawest) executed a second Schedule on October 5, 2001, which contains the same limits chart and SIR cap as the first Schedule. Ex. 4 at NU-CO 02038, 2041.

**F.     Intrawest Concedes the Program Consists of Multiple Documents**

43.     In a 2003 case Intrawest filed in California against National Union regarding the same Program, Intrawest conceded that the Program is a unique program governed by multiple documents, that the policies were subordinate to the other program documents, and the policies must be examined in context with the other Program documents:

> [T]his case is unlike most insurance cases, where the policy is the only contract in issue… **The policies** issued Intrawest **are** part of, issued pursuant to, **subordinate to, and governed by, the larger Program**… **The ultimate obligations of National Union are defined therefore not by the component Policies** (which might be supplemented or replaced with "revised or different schedules or policies") **but by the Program**…. In addition, as noted, **the Court must examine the policies in their context, which is the OCIP, not a void**… Intrawest contends that the language of the [National Union] policies, and in particular **the language of endorsements 002, 003, and 009, taken together, should be construed in light of the overarching purpose of the Program**… (Ex. 34 at p. 2, 4, 5, 16, and 21) (emphasis added).

### G. Intrawest Never Asked for Separate Limits Without an Overall Aggregate and Conceded the Program Provides a $5 Million Total Aggregate Limit

44.     In response to interrogatories, Intrawest delineates only four documents it authored allegedly evidencing that it asked Willis to procure separate completed operations limits at each project without an overall aggregate, but none reference the completed operations aggregate limit at all. Ex. 35 at INT003822-25, 3780-81, 3781, and 689-91.

45.     Willis confirmed that Intrawest never asked it to procure a $5 million completed operations aggregate limit at each individual project. Ex. 36 at Response No. 11, p. 15-16.

46.     On July 12, 2002, a general contractor wrote to Mr. Greehey (Intrawest) asking "[i]s it possible for the other OCIP projects to make claims against the insurance that could reduce the limits set for the Squaw project? Are all limits still available or have any aggregates been reduced?" Ex. 37 at 11763.

47.     On July 19, 2002, Mr. Greehey (Intrawest) answered affirmatively, stating "[i]t is possible that claims from other OCIP projects would affect the limits that are available to Squaw… There is one claim that can significantly affect the primary policy involving … another Amako project at Copper Mountain. If the $5MM aggregate limits are eroded the umbrella and the excess layers will drop down." Ex. 38 at 173858.

48.     On November 25, 2010, Linda Huot (Intrawest) advised Reliance, one of Intrawest's excess insurers, that the Reliance policy was implicated because it was excess "over a $5MM General Liability policy and a $10MM umbrella policy." Ex. 39 (REL000153).

## IV.   ARGUMENT

### A. The Policies Do Not Preclude Consideration of Other Program Documents Because the Schedules Are Part of the Same Contract as the Policies

Intrawest's attempt to construe the limits issue by plucking a single clause out of context contravenes well-settled law. Where several documents are part of a single transaction, they

should be interpreted together, as a whole, not in isolation. *Premier Farm Credit, PCA v. W-Cattle, LLC*, 155 P.3d 504, 517 (Colo. App. 2006).   A contract must be construed to harmonize every provision so that none is superfluous. *Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 700 (Colo. 2009); *Gandy v. Park National Bank*, 615 P.2d 20, 22 (Colo. 1980).   Put another way, the court cannot view clauses in isolation or adopt a reading that yields an absurd result. *Id.* at 697. *See also Weinstein v. Park Funding Corp.*, 879 P.2d 462, 466 (Colo. App. 1994).

The Indemnity Agreement, Schedules, and policies here constitute a single contract.   SOF 32, 43.   The Indemnity Agreement expressly provides that it, the Schedules, and policies "are a uniquely negotiated, *single contract*, and no part of the Program would have been issued without the other parts being in force."   SOF 32.   Intrawest concedes in its brief that these documents were all created as part of the same program. *See* ECF No. 523 at 15 ("Intrawest does not dispute that these documents [the Indemnity Agreement and Schedules] were created as part of the OCIP or that they may be relevant to the 'program'").   Contrary to its current position, in prior litigation, Intrawest asserted in 2004 that the policies are *governed by* the Program:

> [The policies] are part of, issued pursuant to, *subordinate to, and governed by*, the larger Program…[and] are not free standing, but are embedded in a larger agreement which is expressly stated to 'govern' these policies…*the Court must examine the policies in their context, which is the OCIP, not a void*.   (SOF 43).

As there is no dispute that the Indemnity Agreement, Schedules, and policies are all part of a single contract, the Program documents must be read together to effectuate the parties' intent.

### B.   The Schedules Confirm and Clarify, but Do Not Amend, the $5 Million Total Completed Operations Aggregate for All Projects

Contrary to Intrawest's assertion, the changes condition does not apply to preclude consideration of the other Program documents because it only applies where a policy's terms are "amended."   The Schedules do not "amend" the $5 million limit, they confirm it.   The policies' "Limits of Insurance" (Section III) states that the "Completed Operations Aggregate limit is the

most we will pay … for damages … included in the 'products-completed operations hazard.'" SOF 5.  The declarations pages provide that the "Completed Operations Aggregate Limit" is $5 million.  SOF 4.  These provisions collectively provide that the most National Union agreed to pay for completed operations claims is $5 million.

Endorsement 9 is consistent with, and does not alter, the $5 million limit on the declarations page.  Endorsement 9 expressly provides that "[a]ll other terms, conditions and exclusions remain the same" (SOF 28), meaning the endorsement does not abrogate other provisions "not explicitly referred to in the endorsement," such as the $5 million limit provided by the declarations page and the Limits of Insurance.  *See U.S. Underwriters Ins. Co. v. Kum Gang, Inc.,* 443 F. Supp. 2d 348, 357-58 (E.D.N.Y. 2006).

Intrawest ignores the other terms of Endorsement 9 and takes the phrase "separately on a per project basis" out of context to seek to enlarge the limit in the declarations page.  SOF 28.  However, Endorsement 9 states that the actual numerical limit is "*$5,000,000 Aggregate* for the extended completed operations period" and "is not reinstated annually," confirming the $5 million total limit reflected elsewhere in the policies.  *Id.*  Properly viewed in context, as Colorado law requires, the phrase "separately on a per project basis" clarifies that the completed operations limit can be fully used at any one project.  Consistent with the *Copper Mountain* Court's reasoning, if the parties had intended to increase the limits 71-fold, they would have done so explicitly.  *See* 208 P.3d at 700.  The contract should not be read to yield this absurd result.  *See Weinstein*, 879 P.2d at 466.

Intrawest's motion also emphasizes the importance of dictionary definitions, but fails to consider the meaning of "aggregate."  "Aggregate" is defined as a "single whole or total." Black's Law Dictionary (10th ed. 2014); Webster's II New College Dictionary (3rd ed. 2005).

Thus, the "whole" or "total" limit is $5 million.  This provision must be read harmoniously with the "per project" phrase.  *See Copper Mountain*, 208 P.3d at 696-97.  The only way to harmonize the terms is by giving effect to the $5 million "whole" or "total" limit and reading the "per project" language to acknowledge that the limit does not have to be shared equally between the contemplated projects, but may be fully expended at one project.

Because the Program documents do not amend the policies, but are all meant to be read together to comprise the Program, which Intrawest has admitted in prior litigation, the cases Intrawest cites on the integration clause are irrelevant and do not apply.  Those cases simply stand for the principle that documents created before a contract is executed should not be considered.  *See Warren v. Liberty Mut. Fire Ins. Co.*, 691 F. Supp. 2d 1255, 1266 (D. Colo. 2010) (disclosure form executed in 1996 may not change the meaning of a policy issued in 2001 to limit "APIP benefits"); *Materials Evaluation & Tech. Corp. v. Mid-Continent Cas. Co.*, No. 1:10-CV-740, 2011 WL 7052801 (E.D. Tex. Dec. 14, 2011) (rejecting argument that terms of a 2002 policy should control over the different terms of a 2003 renewal policy when the loss took place during the 2003 renewal policy period); *Drs. Bethea, Moustoukas & Weaver LLC v. St. Paul Guardian Ins. Co.*, 376 F.3d 399, 402-05 (5th Cir. 2004) (rejecting pre-policy issuance brochures should be deemed to provide unconditional free coverage materially modifying contrary terms of the policy); *Brennan v. Farmers Alliance Mut. Ins. Co.*, 961 P.2d 550, 555 (Colo. App. 1998) (notice form did not alter terms of the policy)

In contrast, the Schedules here are not extrinsic agreements entered into before the policies were issued, but are all part of a single "unique" contract.  SOF 32, 43.  The Schedules also do not amend the policies; they merely confirm the $5 million total completed operations aggregate already provided in the policies.  Moreover, a changes condition "does not foreclose

the possibility of future agreements." *Nakashima v. State Farm Mut. Auto. Ins. Co.*, 153 P.3d 664, 668 (N.M. Ct. App. 2007). Here, the first policy became effective in 1998, but the Indemnity Agreement and Schedules were executed in 2000 and 2001. SOF 37, 42. Thus, Intrawest cannot rely on the changes condition to shield the Court from viewing the Schedules.

**C.      Intrawest's Reliance on Other Terms in the Schedules Undermines Its Position that Only the Policies Must be Considered**

The $500,000 SIR aggregate and the $15 million general aggregate are found nowhere in the policies. SOF 35. They are only set forth in the Schedules. *Id.* Yet, Intrawest concedes that the Program has a $500,000 SIR aggregate and a $15 million general aggregate. SOF 34-36. In this regard, Intrawest looks to the Schedules to limit is self-insured exposure, but claims the Schedules cannot be viewed to evidence National Union's maximum exposure. The Schedules provide the GL limits as follows:

**Per Project**
| | |
|---|---|
| **$2,000,000** | per occurrence |
| **$5,000,000** | General Aggregate |
| **$5,000,000** | Completed Operations Aggregate |

**All Projects**
| | |
|---|---|
| **$15,000,000** | General Aggregate |
| **$5,000,000** | Completed Operations Aggregate (SOF 33). |

The chart makes it clear that the general aggregate and completed operations aggregate apply in the same manner. They both have a per project limit subject to an all project maximum. Intrawest concedes this straightforward structure for the general aggregate, but denies it exists for the completed operations aggregate, for obvious reasons.

Intrawest's interpretation would improperly render superfluous the "all projects" completed operations aggregate in the Schedules. *See Gandy*, 615 P.2d at 22. "All" is defined as the "the total entity or extent of" or "whole number, amount, or quantity of." Webster's II New

College Dictionary (3rd ed. 2005).   Thus, the completed operations limit for the "total" or "whole" amount of Intrawest's projects is $5 million.   Intrawest cannot exponentially increase its coverage by pretending that no overall aggregate exists for the completed operations component, while acknowledging the same all projects aggregate for the general aggregate.

If Intrawest did not believe the Program had a $5 million all projects completed operations limit, it would not have executed the Schedules on two occasions (SOF 37, 42), and it would not have agreed that the all projects general aggregate is $15 million.   SOF 34-35. Clearly, the Schedules set overall maximum aggregate limits for a multi-year program that allows Intrawest to continually enroll new projects.   Intrawest's attempt to unilaterally and limitlessly increase its insurance and National Union's exposure is unreasonable in light of the Schedules' obvious overall aggregate.

### D.   The Communications Between National Union and Willis Confirm The $5 Million All Projects Aggregate Limit

Intrawest's position that only the policies are relevant is especially curious considering Intrawest opposed National Union's pre-discovery motion for summary judgment on grounds that it needed discovery to determine the parties' intent.   *See* ECF No. 112 at 2, 8, and 11; ECF No. 104 at 5; ECF No. 105.   Tellingly, after almost two years of discovery, Intrawest's motion for partial summary judgment asks this Honorable Court not to consider any of the evidence that it claimed was so necessary two years ago.   This Court should decline Intrawest's request to ignore the insurmountable evidence confirming the parties' intent that the National Union Program provided one $5 million aggregate for all projects.

National Union repeatedly advised Willis throughout the entire underwriting process that the completed operations coverage would be subject to a $5 million total aggregate.   Just like the Schedules, National Union's April 1998 proposal set forth the same chart showing an All

Locations $5 million completed operations aggregate.  SOF 8.  The proposal further provided that unlike the general aggregate limit, there would only be "*one aggregate* for the extended reporting period." *Id.* (emphasis added).

Emails during the underwriting process leave no doubt as to the parties' understanding. On May 13, 1998, Mr. Parrow emailed Mr. Hall asking if the completed operations aggregate applied on a per project basis similar to the ongoing operations coverage.  SOF 11.  Mr. Parrow's email did not ask to eliminate the all locations total aggregate.  SOF 12-13.  Rather, he only asked if the completed operations coverage applied *similar* to the ongoing operations coverage, which has a per project – not per location – limit subject to an all location aggregate.  *Id.*  Mr. Hall advised:  "*there is only one aggregate for the entire Extension Period.  The limit will apply per project but the total aggregate for all losses in the Extension will remain $5,000,000.*"  SOF 14 (emphasis added.)  In other words, the $5 million limit can be fully used at any one project, but the total limit of completed operations coverage is $5 million.  Mr. Parrow did not contest Mr. Hall's statement in the May 13, 1998 email.  SOF 15.

In May 1998, National Union issued a binder with a chart confirming the $5 million all locations limit.  SOF 17.  The completed operations limit was not addressed again for almost a full year.  After National Union provided Willis with the 1998-1999 policy, Mr. Parrow emailed Mr. Riela (National Union) stating that the completed operations endorsement should say the completed operations aggregate applies "per project."  SOF 21.  Mr. Riela's response was:  "we are not in agreement that the $5 million aggregate [applies] separately per project.  *To clarify, the $5 million aggregate, as stated in the binder, applies to all projects* and is not reinstated annually."  SOF 22 (emphasis added).  Mr. Parrow forwarded his May 13, 1998 email exchange to indicate the agreement reached with Mr. Hall:  "*[t]he limit will apply per project but the total*

*aggregate for all losses in the Extension will remain $5,000,000.*"   SOF 23.   Mr. Riela then amended Endorsement 9 to add the phrase "per project."   SOF 25.

Willis's acceptance of National Union's statements that the limits were $5 million provides conclusive evidence of its understanding.   First, the day after a meeting with Mr. Parrow (Willis), Mr. Riela memorialized their discussion in an email, stating that Willis agreed that the completed operations coverage was subject to a $5 million all locations aggregate.   SOF 30.   Mr. Riela thereafter emailed Mr. Parrow confirming the aggregate "shall not exceed in combination $5,000,000." SOF 31.   Mr. Parrow did not contest Mr. Riela's statements. *Id.*

"[S]ilence or inaction will be deemed acceptance of offer" when the relationship between the parties sets an expectation of a response. *See Haberl v. Bigelow,* 855 P.2d 1368, 1373-74 (Colo. 1993).   If Willis thought there was any chance National Union misstated the exposure at $5 million, Willis, a sophisticated and leading broker, would not have remained silent.   Willis's silence after each communication belies its litigation-created position that it procured Intrawest individual $5 million completed operation aggregate limits with no all location aggregate.

### E. The Premium Contradicts Intrawest's Position and Reflects a $5 Million Aggregate, Not $355 Million

Intrawest ultimately enrolled 71 projects in the Program.   SOF 9.   Under Intrawest's claim of a separate $5 million limit at each project with no overall aggregate, the Program would provide up to $355 million in completed operations coverage for a premium of $560,777.   SOF 18-19.   The undisputed evidence is that National Union would not have issued a Program allowing unlimited enrollment without an aggregate cap, and that $355 million limits would require a premium exponentially higher than $560,777.   SOF 19.

**F.     Intrawest Never Requested Separate Limits Without an Aggregate and Willis Never Asked to Remove the $5 Million Aggregate**

Of the over one million pages of documents produced in this case, Intrawest cannot locate a single word supporting its position.  When asked in discovery to produce evidence that it requested Willis to procure separate limits at each project, Intrawest cited 23 documents, 19 of which Intrawest did not even author.   SOF 44.  Of the 4 documents Intrawest authored, *none* address the completed operations aggregate limit. *Id.*  To the contrary, Willis admits Intrawest never requested separate $5 million completed operations limits at each project, without any maximum.  SOF 45.   Moreover, Willis never asked to remove the $5 million all location aggregate in National Union's proposal, binder, or Schedules, and never questioned National Union's assertions that the Program provided a $5 million total all project aggregate.  SOF 8, 14, 17, 22, 31, 33, 42.

In addition, Willis repeatedly admitted in writing that National Union's completed operations aggregate for all locations was $5 million total.  On March 10, 2000 and April 5, 2000, Willis admitted the Indemnity Agreement "shows a 5mm agg applicable to all projects" and "is written to refelct [sic] the singe [sic] aggregate."  SOF 38-39.  On January 20, 2001, Willis admitted "the aggregate limit for the program for this coverage is $5,000,000."  SOF 40.  On September 6, 2001, Willis acknowledged that besides the maximum premium rate, "all things stayed the same as on the issued policies" for the 14-month extension.  SOF 41.  The only reasonable inference these statements elicit is that Willis understood the completed operations aggregate was $5 million total.

**G.     Intrawest Admitted the Program Provides a $5 Million Aggregate Limit**

Prior to this litigation, Intrawest also conceded that the Program only provides a $5 million total completed operations aggregate limit for all projects on several occasions.  For

example, in July 2002, Mr. Greehey (Intrawest) admitted that claims at one project could erode the limits at another project: "[i]t is possible that claims from other OCIP projects would affect the limits that are available to Squaw… If the $5MM aggregate limits are eroded the umbrella and the excess layers will drop down." SOF 46-47. If a separate $5 million limit at each project existed, then Mr. Greehey would not have said that claims from one project could affect the limits available for another project, and he would not have felt compelled to provide reassurances that after the initial $5 million, the umbrella policy would be implicated.

Later, in November 2010, Ms. Huot (Intrawest) advised Reliance that the Reliance policy was "over a $5MM General Liability policy and a $10MM umbrella policy." SOF 48. In other words, the Reliance policy was in excess of $5 million from National Union and $10 million from Federal. Mr. Greehey and Ms. Huot's pre-litigation emails reveal Intrawest's understanding of the Program that the limit was one $5 million aggregate for all projects, and contradicts Intrawest's current position.

WHEREFORE, National Union respectfully requests that this Honorable Court deny Intrawest's Motion for Partial Summary Judgment in its entirety, with prejudice.

Dated:  November 2, 2015                    Respectfully Submitted,

                                           *s/Douglas A. Stevens*

                                           _____
                                           Douglas A. Stevens
                                           Caplan and Earnest LLC
                                           1800 Broadway, Suite 200
                                           Boulder, CO  80302-5289
                                           Tel:  303-443-8010
                                           dstevens@celaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of November, 2015, I electronically filed the foregoing with the Clerk of the Court via CM/ECF system which will send notification to:

Kellie Nelson Fetter
Katherine Dawson Varholak
Christopher R. Mosley
Sherman & Howard, L.L.C.-Denver
633 17th Street, #3000
Denver, CO  80202-3622
Tel.: 303-297-2900
Fax: 303-298-0940
cmosley@shermanhoward.com
kvarholak@shermanhoward.com
kfetter@shermanhoward.com
nbuchheit@shermanhoward.com
ATTORNEYS FOR INTRAWEST ULC
formerly known as INTRAWEST CORPORATION

Cathleen Hopfe Heintz
Wilson Elser Moskowitz Edelman & Dicker, LLP
1512 Larimer Street, Suite 550
Denver, CO  80202
Tel:  303-572-5300
Fax: 303-572-5301
Cathleen.heintz@wilsonelser.com
ATTORNEY FOR NATIONAL FIRE INSURANCE COMPANY
OF HARTFORD AND CONTINENTAL CASUALTY CORPORATION

Dean J. Vigliano
Michael Phillip O'Bresly
Donald W. McCormick
Colliau Elenius Murphy Carluccio Keener & Morrow-NY
125 Broad Street - 7th Floor
New York, NY  10004-2400
Tel:  212-440-2746
Fax:  212-440-2749
dean.vigliano@cna.com
michael.o'bresly@cna.com
Donald.McCormick@cna.com
ATTORNEY FOR CONTINENTAL CASUALTY COMPANY

Elizabeth M. Banzhoff
Leonard H. MacPhee
Perkins Coie LLP-Denver
1900 16th Street, Suite 1400
Denver, CO  80202-5255
Tel:  303-291-2300
Fax:  303-291-2400
Ebanzhoff@perkinscoie.com
lmacphee@perkinscoie.com
ATTORNEYS FOR THIRD-PARTY DEFENDANTS

James A. Johnson
Brett Marshall Godfrey
Anne Zellner Nolte
Aaron L. Hayden
Godfrey Johnson, P.C.
9557 South Kingston Court
Englewood, CO  80112-5952
Tel.: 303-228-0700
Fax: 303-228-0701
godfrey@gojolaw.com
johnson@gojolaw.com
nolte@gojolaw.com
hayden@gojolaw.com
ATTORNEYS FOR FEDERAL INSURANCE COMPANY

David Michael Satnick
John Anthony Piskora, Jr.
Lindsay S. Feuer
Loeb & Loeb, LLP-New York
345 Park Avenue
New York, NY  10154-0037
Tel:  212-407-4823
Fax:  212-407-4990
dsatnick@loeb.com
jpiskora@loeb.com
lfeuer@loeb.com
ATTORNEYS FOR THIRD-PARTY DEFENDANTS

John William Patton, Jr.
Paul Donald Motz
Amy M. Kunzer
Patton & Ryan
330 North Wabash
Suite 3800
Chicago, IL 60611

312-261-5160
312-261-5161 (fax)
jpatton@pattonryan.com
pmotz@pattonryan.com
akunzer@pattonryan.com
ATTORNEY FOR NATIONAL UNION FIRE INS.
CO. OF PITTSBURGH, PA.

s/Shelley McKinstry, Paralegal
_____